# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| DANIEL TERWILLIGER, derivatively on behalf of DRIVEN BRANDS HOLDINGS INC., | Case No.: |
|      Plaintiff, | |
|      vs. | **DEMAND FOR JURY TRIAL** |
| JONATHAN G. FITZPATRICK, TIFFANY L. MASON, NEAL ARONSON, CATHERINE HALLIGAN, CHADWICK HUME, RICK PUCKETT, KAREN STROUP, PETER SWINBURN, MICHAEL THOMPSON, and JOSE TOMÁS, | |
|      Defendants, | |
|      and | |
| DRIVEN BRANDS HOLDINGS INC., | |
|      Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Daniel Terwilliger ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Driven Brands Holdings Inc. ("Driven" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jonathan G. Fitzpatrick ("Fitzpatrick"), Tiffany L. Mason ("Mason"), Neal Aronson ("Aronson"), Catherine Halligan ("Halligan"), Chadwick Hume ("Hume"), Rick Puckett ("Puckett"), Karen Stroup ("Stroup"), Peter Swinburn ("Swinburn"), Michael Thompson ("Thompson"), and Jose Tomás ("Tomás")

(collectively, the "Individual Defendants," and together with Driven, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Driven, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and against Defendants Fitzpatrick and Mason for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Driven, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from October 27, 2021 through August 1, 2023, both dates inclusive (the "Relevant Period").

2.      Driven represents itself to be "the largest automotive services company in North America with a growing and highly-franchised base of approximately 5,000 locations across 49 U.S. states and 13 other countries."[1] The Company operated on an acquisition model, whereby the Company's success was largely dependent on its ability to acquire smaller, local, and regional

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1804745/000180474524000005/drvn-20231230.htm

2

businesses in the "highly-fragmented automotive care industry" and harmoniously integrate them into the Company's operating structure. If done successfully, this would allow the Company to reap the benefits of scale, synergies, and efficiencies. With respect to its acquisition strategy, the Company touted its "ability to drive performance improvement post-acquisition through upfront cost synergies as well as incremental revenue growth opportunities from Driven's platform and economies of scale."

3.      Shortly before the Relevant Period, in October 2021, the Company announced to investors a plan to rapidly and significantly increase its revenue and earnings growth, stating that two of the three most important components of this growth plan were to: (1) increase revenue by rapidly acquiring a network of auto-glass businesses around the country; and (2) increase earnings by driving customer retention and sales in Driven's purportedly stable car wash segment. The Company represented that this growth plan would more than **double** EBITDA by 2026, bringing it from just over $350 million to at least $850 million.

4.      About three months later, in January 2022, the Company announced that it would be expanding its business into the U.S. auto glass market, which it represented would be the keystone of its plan to drive its revenue and earnings. Indeed, the Company stated that the U.S. auto glass market was worth "approximately ***$5 billion and growing***,"[2] a market opportunity equal to Driven's *entire* 2021 revenue. The Company also represented to investors that the success it had experienced with its acquisition and integration of smaller, regional companies was in large part due to the Company having employed a powerful, reproducible, and proven "bolt-on" and "tuck-in" strategy to mergers and acquisitions ("M&A"). Pursuant to the "bolt-on" approach, the Company would buy a "base" or "platform" business in an automotive segment and then "bolt-

_____

[2] All emphasis has been added unless otherwise noted herein.

on" smaller businesses, effectively absorbing them into the established platform. The "platform" business would function as the central nervous system of Driven's particular business segment and allow operational control and services to flow effortlessly to—and revenue to flow effortlessly from—the many branches comprising the individually acquired businesses.

5.      The first step of the Company's "bolt-on" M&A strategy was implemented when Driven revealed that it had completed the acquisition and assimilation of the "base" for its auto-glass network, Auto Glass Now ("AGN"). Following this acquisition, Defendants represented to investors that the Company would "leverage our growth blueprint" rapidly to acquire "a robust pipeline" of smaller auto-glass providers around the U.S., integrating them effortlessly into the Company's AGN "base" as a means to "significantly accelerate our presence in this segment." Defendants continuously emphasized throughout the Relevant Period that the Company's expansion into the auto-glass industry and Driven's purported positive financial performance associated therewith would be quick.

6.      Investors also focused on the performance of the Company's purportedly stable car wash segment in providing steady growth as part of the Company's plan to boost its earnings. The Company's car wash segment was a key component of Driven's overall financial success, making up more than 10% of all revenue throughout the Company and more than 30% of Driven's earnings at the start of the Relevant Period.

7.      During the Relevant Period, Defendants made a series of statements touting the Company's growth strategy and the strength of its car wash and auto-glass segments. In particular, Defendants represented that the Company was accomplishing its goal of rapid growth by, *inter alia*, successfully garnering customer loyalty in its car wash segment through steady and consistent operational performance and, further, by effectively integrating its auto-glass network. However,

4

despite Defendants' rosy representations regarding the success of its car wash and auto-glass segments, the truth was that both segments were facing severe obstacles which would negatively impact Driven's aggressive growth strategy.

8.      The truth began to emerge on October 26, 2022 when the Company revealed delays in its auto-glass segment's ability to service insurers, with Defendant Fitzpatrick disclosing that the auto-glass business was still a year away from being able to service insurers, which would not be added until "late 2023 and 2024." Analysts responded negatively to this development, with one noting on the earnings call that "a lot of investors are eager for you to open up that insurance opportunity" since it would "probably double the TAM [total addressable market]." Driven also announced that, with respect to its car wash segment, same-store sales had **_declined 3.4%_** year-over-year even ignoring foreign exchange issues.

9.      On this news, the price per share of the Company's stock fell $2.31 per share, or over 7%, from a closing price of $32.37 per share on October 25, 2022 to close at $29.96 per share on October 26, 2022.

10.     Still, despite this partial emergence of the truth, Defendants continued to mislead investors with respect to the true extent of the issues plaguing Driven's car wash and auto-glass segments.

11.     The truth continued to emerge on May 8, 2023 when Driven announced that it had terminated Defendant Mason as the Company's Chief Financial Officer ("CFO") on May 4, just one day after the Company had announced its financial results for the first quarter of 2023. In its announcement, the Company also reaffirmed its 2023 guidance issued on May 3 and announced that Gary Ferrara ("Ferrara") would be replacing Defendant Mason as CFO effective May 10, 2023. In addition, the Company announced that it would be postponing its investor day conference

5

until September 2023 "due to the Company's recent CFO transition."

12.    The truth fully emerged on August 2, 2023 when, during an earnings call, Driven admitted that the Company's integrations in its glass segment were "***several quarters behind***" and were "***not going as quickly as planned.***" Due to the foregoing, the Company disclosed that it would substantially reduce the scope of its campaign for glass acquisition and would slash its new glass unit store growth for 2023 by about one-third, from 130 down to 90, as a way to "get the integration completed." In addition, with respect to its car wash segment, Driven announced a further 4% year-over-year same-store car wash sales decline, admitting that falling same-store sales were driven by "significant competitive . . . growth" over the prior two years and further revealing that the Company was in fact losing significant numbers of customers to these competitors. Due to these growing problems with its car wash and glass segments, the Company's two key growth drivers, Driven slashed its EPS guidance for 2023 by ***24%***, despite the fact that the Company had reaffirmed prior guidance just two months earlier.

13.    Notably, these disclosures evidenced that the problems Driven had been experiencing with its glass and car wash segments had been going on for quite some time. Indeed, when analysts inquired as to why the Company was only just then disclosing that it was "several quarters behind" with its glass segment, particularly given that those issues likely would have been "emerging" for a fair amount of time, Defendant Fitzpatrick explained that Defendant Mason's termination and replacement by Ferrara "60-or-so days ago" had provided "a chance for Gary with a fresh set of eyes to look at the business, to look at the assumptions" and determine that "we're probably a little bit behind where we want to be." He also admitted that the competitive intrusion issues plaguing the Company's car wash segment had been growing over "the last two years." In other words, Defendant Fitzpatrick effectively conceded that there had been no substantial

6

developments that changed the progress for either business, but rather that the Company's new CFO had examined the same facts known to Defendants during the Relevant Period and had discovered, in less than two months, that these statements were inaccurate. Former Company employees interviewed in the Securities Class Action (defined below) also corroborated these accounts, confirming that Defendants had been well aware of the issues with its two core segments at all relevant times but had failed to inform investors of the same.

14.     On this news, the price of the Company's common stock fell $10.63 per share, or ***approximately 41%***, from a closing price of $25.83 per share on August 1, 2023 to close at $15.20 per share on August 2, 2023.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

16.     In addition, Defendants' statements failed to disclose, *inter alia*, that: (1) the construction of the Company's "platform" was incomplete and not functional, was plagued by

7

fundamental issues, was operating through a POS system that would need to be recreated entirely, and was unable to service critical customers, including insurers; (2) due to the growing problems with Driven's auto-glass integration, the Company's timeline to complete integration experienced significant delays; (3) AGN's POS system, which was a crucial gating step for further integration, would need to be recreated from scratch, which would cause significant delays in integration and, thus, in Driven's growth and profitability; (4) even after construction of the improved POS system, integration would still only reach 50% completion; (5) the aforementioned delays were severely impacting Driven's auto-glass segment's performance, since a plethora of Driven's acquired businesses were unable to communicate with the AGN platform, the Company was unable to service key customers, and the Company was unable to integrate its new acquisitions; and (6) due to the foregoing, Driven's revenue and earnings growth would be negatively impacted. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

17.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

18.     Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in a lucrative insider sale of Company common stock while the price of stock was artificially inflated, obtaining proceeds of ***over $225 million.***

19.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO")/President, and its former CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Western

8

District of North Carolina (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's/President's, the former CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Driven. Plaintiff has continuously owned Company common stock since first purchasing the stock on February 17, 2021.

### Nominal Defendant Driven

27.     Driven is a Delaware corporation with its principal executive offices at 440 South Church Street, Suite 700, Charlotte, NC 28202. Driven's common stock trades on The Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "DRVN."

### Defendant Fitzpatrick

28.     Defendant Fitzpatrick has served as the Company's President and CEO since July 2012 and as a Company director since April 2018. He also previously served as a member of the board of managers of Driven Investor LLC.

29.     The Schedule 14A the Company filed with the SEC on March 27, 2024 (the "2024 Proxy Statement") stated the following about Defendant Fitzpatrick:

> Jonathan Fitzpatrick serves as our President, Chief Executive Officer, and a member of our Board of Directors. Mr. Fitzpatrick has served as our President and Chief Executive Officer since July 2012, as a member of our Board of Directors since April 2018, and previously served as a member of the board of managers of Driven Investor LLC. Mr. Fitzpatrick currently serves as a member of the board of directors of Nothing Bundt Cakes, a gourmet bakery, privately held by affiliates of

Roark Capital Management, LLC. Prior to joining the Company, Mr. Fitzpatrick served in various capacities with Burger King Corporation (a fast food restaurant company) both prior to and after its acquisition by 3G Capital (a global investment firm). Between February 2011 and June 2012, he was Executive Vice President, Chief Brand and Operations Officer for Burger King. From October 2010 to February 2011, he was Executive Vice President of Global Operations and between August 2009 and October 2010, Senior Vice President of Operations, Europe, Middle East, and Africa. Prior to this role, he was Senior Vice President, Development and Franchising from July 2007 through August 2009. Mr. Fitzpatrick earned a Bachelor's and Graduate degree from University College in Dublin, Ireland.

Qualifications: Mr. Fitzpatrick's experience as the President and Chief Executive Officer of Driven Brands, as well as his extensive knowledge and leadership experience with franchise companies, provide him with the qualifications and skills to serve as a director.

**Defendant Mason**

30.     Defendant Mason served as Executive Vice President and CFO of the Company from March 2020 until her termination on May 4, 2023.

**Defendant Aronson**

31.     Defendant Aronson has served as Chair of the Board since January 2021 and as a Company director since December 2020. He previously served as a member of the board of managers of Driven Investor LLC.

32.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Aronson made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 15, 2022 | 7,000,000 | $32.19 | $225,329,999 |

Thus, in total, before the fraud was exposed, he sold 7 million shares of Company stock on inside information, for which he received ***approximately $225.3 million*** in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and

11

omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33.     The 2024 Proxy Statement states the following about Defendant Aronson:

Neal Aronson became a member of our Board of Directors in December 2020, previously served as a member of the board of managers of Driven Investor LLC, and has served as chairman of our Board of Directors since the consummation of our initial public offering in January 2021 ("IPO"). Mr. Aronson founded Roark Capital Management, LLC, a private equity firm ("Roark"), and serves as its Managing Partner, a position he has held since 2001. Prior to founding Roark, Mr. Aronson was Co-Founder and Chief Financial Officer for U.S. Franchise Systems, Inc., or USFS, a franchisor of hotel chains. Prior to USFS, Mr. Aronson was a private equity professional at Rosecliff (a successor company to Acadia Partners), Odyssey Partners (a private equity firm), and Acadia Partners (now Oak Hill, an investment firm). Mr. Aronson began his career in the corporate finance department at Drexel, Burnham, Lambert Inc. (a former investment bank). Mr. Aronson received a B.A. from Lehigh University. Mr. Aronson is a designated director nominee by Driven Equity LLC and RC IV Cayman ICW Holdings LLC (collectively, our "Principal Stockholders") under the Stockholders Agreement (as defined below).

Qualifications: Mr. Aronson's experience as a private equity partner, chief financial officer, and in other senior executive leadership roles working with franchise companies in the retail, consumer, and business services industries, and knowledge of complex financial matters provide him with valuable and relevant experience in franchise administration, strategic planning, corporate finance, financial reporting, mergers and acquisitions, and leadership of complex organizations, and provide him with the qualifications and skills to serve as a director.

**Defendant Halligan**

34.     Defendant Halligan has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC. She also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee (the "Governance Committee").

35.     The 2024 Proxy Statement stated the following about Defendant Halligan:

Catherine (Cathy) Halligan became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Ms. Halligan has served as an advisor to Chanel (a fashion company) since 2014. Ms. Halligan served as an Advisor from January to April 2012 and Senior Vice President, Sales & Marketing from July 2010 to December

12

2011 of PowerReviews Inc. (a leading SaaS software for customer reviews and social commerce) and prior to joining PowerReviews Inc., from 2005 to 2010, she held senior marketing and e-commerce roles at Walmart, including Chief Marketing Officer of Walmart.com from 2007 to 2009 and as Vice President Market Development, Global eCommerce from 2009 to 2010. Ms. Halligan also held executive roles at Williams- Somona, Inc., Blue Nile, and Gymboree. Ms. Halligan also serves as a director for Ferguson plc (a North American value-added distributor of infrastructure, plumbing, and HVAC products) where she serves on the Audit, Compensation, and Nominating and Governance Committees, Ulta Beauty Inc. (a retailer of All Things Beauty All In One Place), where she chairs the Compensation Committee and is a member of the Nominating and Governance Committee, and Jeld-Wen Holding, Inc. (a leading global manufacturer of high performance interior and exterior building products) where she serves on the Audit and Compensation Committees. She previously served as a director of FLIR Systems Inc. (a producer of thermal imaging cameras, components, and imaging sensors), where she chaired the Compensation Committee and was a member of the Audit Committee from 2014 to 2021. Ms. Halligan received a B.S. from Northern Illinois University.

Qualifications: Ms. Halligan's extensive board experience and experience in digital transformation, marketing, and retail provide her with the qualifications and skills to serve as a director.

### Defendant Hume

36.     Defendant Hume has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC.

37.     The 2024 Proxy Statement stated the following about Defendant Hume:

Chadwick (Chad) Hume became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Mr. Hume joined Roark in 2009 and currently serves as a Principal. Prior to joining Roark, Mr. Hume worked at Houlihan Lokey (an investment bank) and Bank of America (a financial services company). Mr. Hume received a B.B.A. from the Terry College of Business at the University of Georgia. Mr. Hume is a designated director by our Principal Stockholders under the Stockholders Agreement.

Qualifications: Mr. Hume's experience with his firm's investments in branded consumer companies, expertise in corporate strategy and organization, and relevant experience in the industry provide him with the qualifications and skills to serve as a director.

### Defendant Puckett

13

38.     Defendant Puckett has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC. He also serves as Chair of the Audit Committee.

39.     The 2024 Proxy Statement stated the following about Defendant Puckett:

Rick Puckett became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. From December 2006 to December 2016, Mr. Puckett was the Executive Vice President, Chief Financial Officer and Chief Administrative Officer of Snyder's-Lance, Inc. (a snack food products company). Prior to Snyder's-Lance, Mr. Puckett was Executive Vice President, Chief Financial Officer and Treasurer of United Natural Foods, Inc. (a North American food wholesaler). Mr. Puckett serves as a director, chairman of the Compensation Committee, and a member of the Audit Committee for SPX Corporation (a supplier of highly engineered infrastructure equipment technologies) and as a director, chairman of the Audit Committee, and a member of the Compensation and Nominating and Corporate Governance Committees of Whitehorse Finance, Inc. (an investment company), positions he has held since May 2016 and December 2012, respectively. Mr. Puckett served as a member of the Board of Directors for Pet Valu, Inc., (a pet specialty retailer company, from August 2019 to May 2023) where he served as the Chairman of the Audit Committee. He also served on the Board of Directors for Late July Brands, a privately-held food company, from 2007 through 2010. Mr. Puckett is a Certified Public Accountant, and he received a B.S. in Accounting and an M.B.A. from the University of Kentucky.

Qualifications: Mr. Puckett's experience in leadership roles at his past companies, significant knowledge and understanding of corporate finance and financial reporting, and his expert background as a Certified Public Accountant provide him with the qualifications and skills to serve as a director.

**Defendant Stroup**

40.     Defendant Stroup has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC. She also serves as a member of the Audit Committee and the Compensation Committee.

41.     The 2024 Proxy Statement stated the following about Defendant Stroup:

Karen Stroup became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Ms. Stroup currently serves as the Chief Digital Officer of WEX, Inc. (a payments

14

technology company), where she leads product management, design, data & analytics, and WEX's customer and digital transformation. Prior to WEX, Ms. Stroup was the Chief Digital Officer at Thomson Reuters (a multinational media conglomerate) from 2019-2021, where she led Thomson Reuters's end-to-end transformation to be a global digital company, leveraging data and shared capabilities to improve Net Promoter Score, grow revenue and improve sales and marketing efficiency. Prior to joining Thomson Reuters, Ms. Stroup has also served as Director, Digital BCG Accelerator for The Boston Consulting Group, Chief Digital Officer at TreeHouse (a home upgrade company) in 2018, as Senior Vice President, The Garage at Capital One Financial Corporation (a bank holding company) from 2016 to 2018, and as Vice President, Product Management at Intuit, Inc. (a financial software company) from 2007 to 2016. Ms. Stroup received a B.B.A. from the University of Notre Dame and an M.B.A. from Dartmouth College.

Qualifications: Ms. Stroup's experience in leading digital transformations and delivering results leveraging customer-driven innovation provide her with the qualifications and skills to serve as a director.

**Defendant Swinburn**

42.     Defendant Swinburn has served as a Company director since December 2020 and

previously served as a member of the board of managers of Driven Investor LLC. He also serves

as Chair of the Governance Committee and as a member of the Audit Committee.

43.     The 2024 Proxy Statement stated the following about Defendant Swinburn:

Peter Swinburn became a member of our Board of Directors in December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Mr. Swinburn served as the Chief Executive Officer of Molson Coors (a multinational drink and brewing company) from 2008 to 2014.

He currently serves on the boards of Express Inc. (a specialty retail apparel chain) where he is the Chair of the Compensation and Nominating and Governance Committee. Mr. Swinburn also sits on the boards of Wales Millennium Centre (an arts center), and The Rise (a housing development company) each, a privately-held company. Mr. Swinburn previously served as a director for Cabela's Inc. (a specialty retailer of outdoor recreation merchandise), from 2015 to 2021, High Level Software Ltd (a software company), and Fuller Smith & Turner (a brewing company). Mr. Swinburn received a B.Sc. from University of Wales, Cardiff.

Qualifications: Mr. Swinburn's extensive board experience and significant knowledge and understanding of business development, strategic planning, and consumer brand marketing provide him with the qualifications and skills to serve as a director.

15

**Defendant Thompson**

44.     Defendant Thompson has served as a Company director since December 2020 and

previously served as a member of the board of managers of Driven Investor LLC.

45.     The 2024 Proxy Statement stated the following about Defendant Thompson:

> Michael Thompson became a member of our Board of Directors in December 2020
> and previously served as a member of the board of managers of Driven Investor
> LLC. Mr. Thompson joined Roark in 2010 and currently serves as a Managing
> Director. Prior to joining Roark, Mr. Thompson worked at Montage Partners
> (Phoenix-based private equity firm). Before Montage, Mr. Thompson served as a
> Senior Associate at Kroll Zolfo Copper (a financial advising company). Mr.
> Thompson received a B.A. from Pomona College and an M.B.A. from the
> University of Chicago Booth School of Business. Mr. Thompson is a designated
> director nominee by our Principal Stockholders under the Stockholders Agreement.
>
> Qualifications: Mr. Thompson's involvement with his respective firms'
> investments in various companies, in-depth knowledge, and industry experience,
> coupled with his skills in private financing and strategic planning, provide him with
> the qualifications and skills to serve as a director.

**Defendant Tomás**

46.     Defendant Tomás has served as a Company director since July 2022. He also

serves as a member of the Compensation Committee and the Governance Committee.

47.     The 2024 Proxy Statement stated the following about Defendant Tomás:

> Jose Tomás became a member of our Board of Directors in July 2022. Since 2021,
> Mr. Tomás has served as the Chief Administrative Officer at TelevisaUnivision
> Inc., the leading Spanish-language media and content company in the world. In this
> role, he oversees strategic functions essential to TelevisaUnivision's success,
> including Human Resources; Corporate Communications; Facilities/Real Estate;
> Social Impact; Diversity, Equity and Inclusion; and Corporate Safety, Health and
> Security. Prior to TelevisaUnivision, from 2018 to 2021, he served as co-founder
> and managing partner of BrandSparc, a global communications, branding and
> human resources firm. From 2017 to 2018, he was a member of General Motors'
> global senior executive leadership team where he served as Senior Vice President
> of Global Human Resources. Mr. Tomás also served as Executive Vice President
> and Chief Human Resources Officer at Anthem, Inc. from 2013 to 2017. In this
> role, he was responsible for Human Resources; Corporate Communications;

16

Diversity, Equity and Inclusion; and Corporate Security.

Previously, Mr. Tomás held senior operations and administrative roles at Burger King Corporation, where he served as both president, Latin America and Caribbean region, and Global Chief People Officer. Mr. Tomás has also held human resources positions with Ryder System Inc., and operations and Human Resources roles at Publix Super Markets. Mr. Tomás holds a bachelor's degree in business administration and a master's in management from Florida International University.

Qualifications: Mr. Tomás's experience as a leader with large organizations with expertise in operations, people, and culture provide him with the qualifications to be a director.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

48.     By reason of their positions as officers, directors, and/or fiduciaries of Driven and because of their ability to control the business and corporate affairs of Driven, the Individual Defendants owed Driven and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Driven in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Driven and its shareholders so as to benefit all shareholders equally.

49.     Each director and officer of the Company owes to Driven and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Driven, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.     To discharge their duties, the officers and directors of Driven were required to exercise reasonable and prudent supervision over the management, policies, controls, and

17

operations of the Company.

52.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Driven, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Driven's Board at all relevant times.

53.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

18

54.     To discharge their duties, the officers and directors of Driven were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Driven were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, North Carolina, and the United States, and pursuant to Driven's own Code of Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Driven conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Driven and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Driven's operations would comply with all applicable laws and Driven's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was

19

required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.     Each of the Individual Defendants further owed to Driven and the shareholders the duty of loyalty requiring that each favor Driven's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

56.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Driven and were at all times acting within the course and scope of such agency.

57.     Because of their advisory, executive, managerial, directorial, and controlling positions with Driven, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

58.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Driven.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Driven was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Driven and was at all times acting within the course and scope of such agency.

## DRIVEN'S CODE OF CONDUCT

64.     Driven's Code of Conduct states that it "applies to all Company personnel, as well as to vendors, clients, and others who deal with Company personnel." The Code of Conduct further represents that it "reflects our commitment to these standards [of professional and ethical conduct] and outlines the basic principles and policies with which all employees, officers and directors are expected to comply."

65.     With respect to Conflicts of Interest, the Code of Conduct states the following, in relevant part:

> You must avoid any relationship or activity that could affect your independent judgment in the conduct of Company business or conflicts with or could reasonably give the appearance of conflicting with Company interests. In assessing whether a situation poses a conflict of interest, the Company will examine whether your interest or activity could influence, or could give the appearance of influencing, your decisions on behalf of the Company.
>
> For example, conflicts of interest may arise if: • You cause the Company to engage in business transactions with a company that you, your friends or your relatives control without having obtained the appropriate prior approvals required. (See also under "Related Party Transactions" below). • You are in a position to (i) compete with, rather than help, the Company or (ii) make a business decision not on the basis of the Company's interest, but rather for your own personal advantage. • You take actions, or have personal or family interests, that may make it difficult to perform your work (or discharge your duties and obligations) effectively. • You, or any of your family members or affiliates, receive improper personal benefits other than gratuities and payments received or provided in compliance with the guidelines set forth in "Gifts, Entertainment, Anti-Bribery and Corruption" below, as a result of your position in the Company.

66.     Regarding Corporate Opportunities, the Code of Conduct states the following, in relevant part:

When carrying out your duties or responsibilities, you owe a duty to the Company to advance its legitimate interests. Except as provided in the Company's constituent documents, employees, directors and officers are prohibited from (i) taking for themselves opportunities that arise through the use of corporate property, information or position, (ii) using corporate property, information or position for personal gain and (iii) competing with the Company.

67. In the section "Public Reporting," the Code of Conduct states the following, in relevant part:

Full, fair, accurate and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws and meets the expectations of its stockholders.

Persons responsible for the preparation of such documents and reports and other public communications must exercise the highest standard of care in accordance with the following guidelines: • all accounting records, and the reports produced from such records, must comply with all applicable laws; • all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate; • all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses; • accounting records must not contain any false or intentionally misleading entries; • no transactions should be intentionally misclassified as to accounts, departments or accounting periods; • all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period; • no information should be concealed from the internal audit department or the independent registered public accounting firm; and • compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.

68. Under the heading "Protection and Proper Use of Company Assets," the Code of Conduct states the following:

All employees, officers and directors should promote and ensure the efficient and responsible use of the Company's assets and resources by the Company. Theft, carelessness and waste have a direct impact on the Company's profitability. Any suspected incidents of fraud or theft should be immediately reported for investigation using one of the reporting methods provided in Section XVIII below.

Company assets, such as proprietary information, funds, materials, supplies, products, equipment, software, facilities, and other assets owned or leased by the Company or that are otherwise in the Company's possession, may only be used for

23

legitimate business purposes and must never be used for illegal purposes.

Proprietary information includes any information that is not generally known to the public or would be valued by, or helpful to, our competitors. Examples of proprietary information are intellectual property, business and marketing plans and employee information. The obligation to use proprietary information only for legitimate business purposes continues even after individuals leave the Company.

69. Under the heading "Insider Trading," the Code of Conduct states the following, in relevant part:

Insider trading is unethical and illegal. Employees, officers and directors must not trade in securities of a company while in possession of material non-public information regarding that company. It is also illegal to "tip" or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties. The Company has a Securities Trading Policy, which sets forth obligations in respect of trading in the Company's securities.

70. Under the heading "Fair Dealing," the Code of Conduct states:

Each employee, officer and director, in carrying out his or her duties and responsibilities, should endeavor to deal fairly with each other and the Company's customers, suppliers and competitors. No employee, officer or director should take unfair advantage of anyone through illegal conduct, manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

71. In the section "Compliance with Laws, Rules, and Regulations," the Code of Conduct states:

Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any securities exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety. Employees, officers or directors who fail to comply with this Code and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

72. In the section "Company Records and Document Retention," the Code of Conduct states the following, in relevant part:

24

Records created, received or used during the conduct of Company business, including all communications sent or received using the Company's email system or company equipment, including laptops and mobile phones, are at all times the property of the Company wherever those records may be located. At any time, subject to applicable data privacy laws, the Company and, in certain circumstances, third parties (including government officials), may review, without prior notice to personnel, any and all firm records, including records marked "Personal" or "Private." Any records that you create and store are subject to this Code and may be demanded by third parties during the course of litigation or a government investigation or, in the case of records sent outside the Company, subject to the records retention policies of the recipients. You should, therefore, avoid discriminatory remarks, harassment and threats of violence or similar inappropriate or unlawful conduct. This applies to communications of all kinds, including e-mail, instant messaging, voice mail messages, text messages, video recordings and informal notes or interoffice memos. Records should be retained and destroyed in accordance with the Company's records retention policy.

73. With respect to waivers, the Code of Conduct states the following, in relevant part:

Any waiver of this Code for any executive officer or director will be written and made only by the Board of Directors or Audit Committee and will be promptly disclosed as required by law or stock exchange regulation. Any waiver of this Code for any other employee will be made by the General Counsel.

74. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## DRIVEN'S AUDIT COMMITTEE CHARTER

75. The Company also maintains an Audit Committee Charter (the "Audit Committee

Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is as follows:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Driven Brands Holdings Inc. (the "Company") is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control, risk management and legal compliance functions of the Company. This includes, without limitation, (a) assisting the Board with its oversight of (i) the accounting and financial reporting processes and internal controls of the Company and its subsidiaries, including the audits of the Company's financial statements and the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent registered public accounting firm's qualifications and independence and (iv) the performance of the Company's independent registered public accounting firm and the Company's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

76.     With respect to the responsibilities of the Audit Committee, the Audit Committee Charter states the following, in relevant part:

> (o) Recommend to the Board whether the Company's annual audited financial statements should be included in the Company's annual report on Form 10-K for filing with the SEC and timely prepare an audit committee report required by the SEC to be included in the Company's annual proxy statement;

> (p) Review and discuss with management and the Company's independent registered public accounting firm, the Company's quarterly financial statements and related disclosures under the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section and the results of the Company's independent registered public accounting firm's review of the quarterly financial statements prior to including within the Company's Quarterly Reports on Form 10-Q;

> (q) Review the Company's quarterly earnings press releases (especially the use of "pro forma" or "adjusted" information for compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies. This will generally be before the scheduled releases and such discussions may be general consisting of discussing the types of information to be disclosed and the types of presentations to be made;

77.     The Audit Committee Charter represents that, together "with management, the

Company's independent registered public accounting firm and the head of the Company's internal audit department," the Audit Committee shall review the following:

    i. critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to any filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Company's financial statements;

    ii. major issues regarding, or any significant changes in, the Company's selection or application of accounting standards and principles and the Company's financial statement preparations;

    iii. alternative treatments of financial information that have been discussed by the Company's independent registered public accounting firm and management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Company's independent registered public accounting firm;

    iv. all other material written communications between the Company's independent registered public accounting firm and management; and

    v. the effect of off-balance sheet structures, transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities or other persons on the financial statements of the Company;

    78.    The Audit Committee Charter also discusses the following responsibilities of the Audit Committee:

    (t) Review the internal control report prepared by management, including (i) management's assessment of the effectiveness of the Company's internal control over financial reporting and the Company's independent registered public accounting firm's attestation, and report, on the assessment made by management, in each case, as required by Section 404 of the SarbanesOxley Act of 2002 and (ii) any significant changes in internal control over financial reporting disclosed or considered for disclosure in periodic filings with the SEC as required by the certifications required under Section 302 of the Sarbanes-Oxley Act of 2002, including any corrective actions with regard to significant deficiencies and material weaknesses;

    (u) Receive reports from management regarding, and review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures;

    ***

    (w) Periodically discuss with the Company's independent registered public

27

accounting firm, without management being present, (a) their judgment about the quality, integrity and appropriateness of the Company's accounting principles and financial disclosure practices as applied in its financial reporting and (b) the completeness and accuracy of the Company's financial statements;

(x) Review management estimates that have a material impact on the financial statements and understand the reasonableness of the underlying assumptions and outcomes;

(y) Discuss significant, complex or unusual transactions (such as swaps, derivatives or off-balance sheet transactions) with management and the Company's independent registered public accounting firm;

(z) Receive periodic reports from management to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company;

(aa) Understand how management and the external auditors evaluate materiality, both quantitatively and qualitatively, for financial reporting purposes; focusing its review of financial reporting on "material" areas requiring significant management judgment or that are more susceptible to error or fraud. This includes those areas identified as critical audit matters (CAMs) by the external auditors;

(bb) Establish and maintain free and open means of communication between and among the Board, the Committee, the Company's independent registered public accounting firm, the Company's internal audit department and management, including providing such parties with appropriate opportunities to meet separately and privately with the Committee on a quarterly basis;

79. With respect to responsibilities pertaining to the Company's risk exposure, the Audit Committee Charter represents that the Audit Committee is tasked with the following responsibilities:

(dd) Discuss and oversee policies governing the process by which senior management of the Company assess and manage the Company's risk exposure. Including the following: a. management's identification, monitoring and evaluation of the Company's major financial and other risk exposures including operational, legal, regulatory, business, commodity, major project, strategic, credit, liquidity, derivative, reputation and external risks; b. the development of the Company's enterprise risk management policies and procedures including limits and tolerances, risk roles and responsibilities, risk mitigation decisions and risk related assumptions; c. implementation of policies and procedures ensuring the Company's risks are identified and that controls are adequate, in place and functioning properly; d. review the Company's fraud risk assessment program and controls to mitigate

28

fraud; and e. report regularly to the Board on the Company's enterprise risk management program;

80.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *Driven's Acquisition and Growth-Focused Business Model*

81.     Driven represents itself to be "the largest automotive services company in North America with a growing and highly-franchised base of approximately 5,000 locations across 49 U.S. states and 13 other countries."[3] Throughout the Relevant Period, the Company touted itself as a powerful growth engine in the "large recession-resistant and highly-fragmented automotive care industry." The Company operated on an acquisition model, whereby the Company's success was largely dependent on Driven's ability to acquire smaller, local, and regional businesses in the "highly-fragmented automotive care industry" and harmoniously integrate them into the Company's operating structure. If done successfully, this would allow the Company to reap the

---

[3] https://www.sec.gov/ix?doc=/Archives/edgar/data/1804745/000180474524000005/drvn-20231230.htm

benefits of scale, synergies, and efficiencies. With respect to its acquisition strategy, the Company touted its "ability to drive performance improvement post-acquisition through upfront cost synergies as well as incremental revenue growth opportunities from Driven's platform and economies of scale." Indeed, Driven stated the following, in relevant part, in the prospectus (the "Prospectus") which accompanied its initial public offering ("IPO"):

> [W]e have a proven track record of executing tuck-in acquisitions of independent market participants that are highly value accretive when integrated into our platform based on our ability to drive performance improvement post-acquisition through upfront cost synergies as well as incremental revenue growth opportunities from Driven's platform and economies of scale.

82. The Company represented to its investors that condensing these businesses into one "highly-recognized" brand would bolster loyalty from customers by providing a consistent level of service quality, which, in turn, would improve the quality of Driven's revenue by capturing the same customers to consistently patronize outlets operated by the Company. Indeed, the Company represented to investors that this strategy towards acquisition allowed Driven to offer "exceptional in-store execution," "generat[ing] . . . strong brand loyalty from our customers," and to "driv[e] consistent same store sales growth." Additionally, the Prospectus touted the Company's "historical success in driving revenue and profit growth," including "twelve consecutive years of positive same store sales growth through 2019, including growth through the Great Recession."

83. Defendants repeatedly represented to investors before and during the Relevant Period that Driven's acquisition-focused model was at the heart of the Company's success. Indeed, in the Prospectus, Driven represented that "***M&A is a core competency of the Driven Brands platform.*** We have invested in and built out a dedicated team and supporting infrastructure and processes to systematically source, diligence, acquire and integrate acquisitions." Defendants also continuously touted Driven's "continued ability to pursue and execute upon scalable and highly

strategic M&A as well as integrating large businesses into the Driven Brands platform," its "proven track record" of effectively acquiring and integrating small, independent automotive service providers, and its "ability to pursue and execute upon scalable and highly strategic M&A." They also noted that M&A would continue to be a key driver of the Company's success, stating: "Our track-record of highly-accretive M&A, with acquired companies benefiting from rapid growth and immediate synergies, will continue to be a significant part of the growth story for Driven Brands[.]"

84.     The Company also represented to investors that the success it had experienced with its acquisition and integration of smaller, regional companies was in large part due to the Company having employed a powerful, reproducible, and proven "bolt-on" and "tuck-in" strategy to M&A. Pursuant to the "bolt-on" approach, the Company would buy a "base" or "platform" business in an automotive segment and then "bolt-on" smaller businesses, effectively absorbing them into the established platform. The "platform" business would function as the central nervous system of Driven's particular business segment and allow operational control and services to flow effortlessly to—and revenue to flow effortlessly from—the many branches comprising the individually acquired businesses. During the Relevant Period and as described in further detail in the "False and Misleading Statements" section below, Defendants continuously touted the Company's "bolt-on acquisition machine" as "a consistent and repeatable M&A strategy, having completed more than 40 acquisitions since 2015." Defendants also represented to investors that Driven's bolt-on strategy provided the Company with a competitive advantage in successfully integrating acquired companies seamlessly into the Company platform, stating:

> Once a company has been acquired, we leverage our shared services to enable the acquired business to benefit from our powerful procurement programs, data analytics capabilities, and training services. Every acquisition has been integrated into Driven Brands on plan and has demonstrated improved performance by being

31

a part of our platform rather than operating as an independent company.

85.     Driven also represented that a critical advantage of the Company's bolt-on/tuck-in strategy was speed, with Defendant Fitzpatrick stating that the strategy purportedly allowed Driven to "***immediately*** . . . absorb[] [acquired businesses] into our base business."

86.     Based on these repeated representations, investors and analysts were aware that a core element of the Company's business model was successfully acquiring and integrating these smaller regional and local auto service providers. Moreover, investors and analysts relied on Defendants' rosy assertions which touted Driven's experience, resources, and expertise in executing on this operating plan. For example, analysts at Piper Sandler acknowledged the Company's "recurring revenue model," "12 consecutive years of positive same-store sales growth," and "successful track record" of M&A, pointing to Driven's "dedicated" M&A team and the Company's "skill[] at integrating acquisitions." Similarly, analysts at Barclays highlighted "the consistency of [Driven's] model," which it explained had been "proven through comps, EBITDA growth, and M&A execution against a wide range of economic/macro backdrops," and wrote that "M&A . . . should drive upside" for Driven. In addition, these analysts emphasized that the Company had "sticky customers which drives consistency" and a "long history of achieving positive same-store sales growth, even in difficult macroeconomic environments."

***Driven's Car Wash and Auto Glass Segments Were Core to the Company's Operations and Promise to Deliver Substantial Growth***

87.     Shortly before the Relevant Period, in October 2021, the Company announced to investors a plan to rapidly and significantly increase its revenue and earnings growth, stating that two of the three most important components of this growth plan were to: (1) increase revenue by rapidly acquiring a network of auto-glass businesses around the country; and (2) increase earnings by driving customer retention and sales in Driven's purportedly stable car wash segment. The

32

Company represented that this growth plan would more than ***double*** EBITDA by 2026, bringing it from just over $350 million to at least $850 million. Analysts and investors latched onto these representations, with William Blair telling investors to "expect adjusted EBITDA to more than double over the next five years."

### 1. Driven's Auto Glass Segment

88.    About three months later, in January 2022, the Company announced that it would be expanding its business into the U.S. auto glass market, which it represented would be the keystone of its plan to drive its revenue and earnings. Indeed, the Company stated that the U.S. auto glass market was worth "approximately ***$5 billion and growing***," a market opportunity equal to Driven's ***entire*** 2021 revenue. The first step of the Company's "bolt-on" M&A strategy was implemented when Driven revealed that it had completed the acquisition and assimilation of the "base" for its auto-glass network, Auto Glass Now ("AGN"). Following this acquisition, Defendants represented to investors that the Company would "leverage our growth blueprint" rapidly to acquire "a robust pipeline" of smaller auto-glass providers around the U.S., integrating them effortlessly inro the Company's AGN "base" as a means to "significantly accelerate our presence in this segment." Defendants continuously emphasized throughout the Relevant Period that the Company's expansion into the auto-glass industry and Driven's purported positive financial performance associated therewith would be quick. Indeed, Defendant Fitzpatrick represented during an April 2022 earnings call that "our team is getting faster at executing the Driven Brands' playbook, and we think we'll have even more rapid progress in our glass business," noting that the Company would "leverage our growth blueprint" to "significantly accelerate our presence in this segment."

89.    Analysts accepted these representations from Defendants, with Morgan Stanley

analysts reporting that the Company's auto-glass campaign was "a key growth driver in an attractive, fragmented $5bn industry," with the potential to quadruple Driven's segment-wide earnings in the near-term. Similarly, William Blair analysts reported in February 2022 that the Company's auto-glass acquisition strategy was "expected to greatly enhance Driven's presence in the U.S. auto glass market, providing an additional growth level."

### 2. Driven's Car Wash Segment

90.     Investors also focused on the performance of the Company's purportedly stable car wash segment in providing steady growth as part of the Company's plan to boost its earnings. The Company's car wash segment was a key component of Driven's overall financial success, making up more than 10% of all revenue throughout the Company and more than 30% of Driven's earnings at the start of the Relevant Period.

91.     As discussed in further detail below, Defendants repeatedly pointed to two factors to explain the purported strength and success of the Company's car wash segment. First, Driven boasted of its widespread and expanding network of car wash locations, referring to its car wash segment as "the world's largest car wash company by location count with more than 900 locations across 14 countries[.]" Second, the Company claimed that it had been successful in experiencing customer loyalty by providing consistent service quality across locations and offering a subscription-based car wash program to its customers, where customers would pay a membership fee that would allow for unlimited car washes. At all relevant times, Driven and the Individual Defendants emphasized the importance of the car wash segment to Driven's overall business; indeed, in the Prospectus, Defendants called its car wash store count a "key performance indicator" and touted that its subscription model "foster[ed] strong customer loyalty to our stores" effectively helping to reduce competition – and "generate[d] predictable and recurring revenue." Investors

34

and analysts alike were aware of the importance of Driven's car wash segment on its overall growth strategy, with Goldman Sachs analysts reporting that the Company's "Subscription-based Car Wash model drives recurring revenue," and noting that subscriptions currently "constitute[d] 41% of sales, and the company believes that it can add members to increase penetration to 60%." Similarly, Credit Suisse analysts characterized Driven's "Recurring Revenue Stream" as one of the "Key Drivers" for the Company's car wash business.

### *Driven's Auto-Glass and Car Wash Segments Were Both Facing Major Obstacles Which Would Impact the Company's Aggressive Growth Strategy*

92.     Despite Defendants' rosy representations regarding the success of its car wash and auto-glass segments, the truth was that both segments were facing severe obstacles which would negatively impact Driven's aggressive growth strategy.

### 1.  Driven's Problems With Integration in Its Auto-Glass Segment

93.     Defendants, as early as May 2022, had discovered severe issues in Driven's AGN platform that, as Driven later would admit, halted the "progress" of integration of Driven's auto-glass acquisitions and more than doubled Driven's timeline to complete its acquisition program and deliver on the growth it had promised to investors. Several former Company employees interviewed in the Securities Class Action confirmed that Defendants were aware of these growing issues with Driven's auto-glass acquisitions and integration long before they disclosed the truth to Company investors. Indeed, a senior executive in the Company's auto-glass segment from shortly after the AGN acquisition closed until mid-2023 ("FE-1") explained how, soon after acquiring the AGN platform in December 2021, Driven discovered that its "proven M&A playbook" did not lend itself to the auto-glass segment. FE-1 noted that the Company, soon after the AGN acquisition, learned that each auto-glass business in the Company's acquisition pipeline operated under a different business model and involved different revenue streams and systems, making integration

35

of these acquisitions far more burdensome than Defendants had repeatedly led investors to believe. All of these inputs and outputs were purportedly to be operated by a centralized "POS" sale system run through the AGN platform. A POS is a crucial component of an auto-care segment's operation, having responsibility for compiling, storing, and transmitting all of the acquired company's revenue data. FE-1 stated that one of the first and most important steps of integration for any acquisition is developing a functional POS system, noting that it must be fully developed before much of the remaining integration can start. According to FE-1, it was widely known within the Company that any delay in developing a working POS would delay the integration steps that followed it. FE-1 also admitted that, by May 2022, it was even clearer to Driven and its team overseeing the auto-glass acquisition plan that there were severe issues with the POS system that would prevent Driven from being able to properly integrate its POS nerve center to the different businesses the Company was acquiring. Indeed, FE-1 stated that, by no later than June 2022, he and others at the Company became aware that the problems with AGN's POS system were so severe that a whole new system would need to be developed, causing a delay of at least six months for just completion of the POS integration alone.

94.     Another former Company employee who worked as a Regional Sales Manager for AGN from June to September 2023 ("FE-3") corroborated FE-1's claims, stating that the outlets he oversaw had only achieved 30-50% integration on average by the end of his employment, and noting that in other parts of the country, integration efforts were even further behind. FE-3 also stated that, even by June 2023, the POS integration was still only partially complete.

## 2. Driven's Problems with Its Car Wash Segment

95.     Throughout the Relevant Period, Defendants also failed to disclose to investors that Driven had not adequately invested in service, equipment, and maintenance in its car wash

36

segment and that, as a result, the Company suffered significant impairments to its car wash segment's operating capacity. These issues were well known by the Company's management, including Defendant Fitzpatrick, the Company's CEO. Indeed, former employee testimony given in the Securities Class Action confirmed that management was frequently given reports which outlined the substantial additional investment in car wash maintenance and service that was needed at Driven.

96.     A former Company employee who worked as a Vice President in the Company's car wash segment from April 2022 through May 2023 ("FE-4") stated that the Company's car wash segment was plagued with issues including mechanical failures and problems with maintenance that severely impaired the car wash segment's operating capacity, and that these issues had largely been caused by the Company's failure to properly invest in and budget for repairs, service, and maintenance. FE-4 also explained that Defendant Fitzpatrick received bi-monthly reports detailing maintenance cuts, which were frequently put in place in Driven's car wash segment to cut costs and boost earnings. In addition, another former employee who worked in the Company's car wash segment from before the Relevant Period until early 2022 ("FE-5") confirmed that Defendant Fitzpatrick knew about the extent and scope of the Company's service and maintenance failures, noting that these issues had been communicated to Defendant Fitzpatrick directly. For example, FE-5 explained a time where FE-5 reported these failures to Defendant Fitzpatrick, including the fact that 75% of the Company's car washes needed wholesale mechanical rebuilds." In response, Defendant Fitzpatrick replied, "Wow, it sounds like we should have done better due diligence when we took over" the Company's car wash platform. Despite knowing of these problems, Defendants continued to actively mislead investors by making a series of materially false and misleading statements, discussed in more detail below.

37

**False and Misleading Statements**

*October 27, 2021 Earnings Call*

97.    On October 27, 2021, the Company hosted an earnings call with analysts and investors. During the call, Defendant Fitzpatrick represented that the Company was "committed to having the best stores" and "to offer[ing] customers the best experience" in the car wash business. In addition, Defendant Fitzpatrick stated that the Company's car wash brand "stands for . . . quality."

98.    These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

*November 1, 2021 Press Release*

99.    On November 1, 2021, the Company published a press release boasting of its car wash segment's operating capacity. In relevant part, the press release represented that Driven had "over 300" car washes in the U.S. and that the Company was "the fastest-growing express conveyor car wash operator in North America."

100.   These statements touting the Company's car wash segment's operating capacity were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the

38

Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *February 16, 2022 Earnings Call*

101.    On February 16, 2022, the Company hosted an earnings call with analysts and investors. During the call, when asked by an analyst about the Company's investment in upgrading car wash equipment as a means of attracting and retaining customers, Defendant Fitzpatrick responded, "[W]e are continuing to invest into the existing asset base as well specifically to upgrade equipment, to add maybe incremental components to that equipment package, which then helps driving incremental new customers."

102.    These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 27, 2022 Earnings Call*

103.    On April 27, 2022, the Company hosted an earnings call with analysts and

investors. During the call, Defendant Fitzpatrick represented that the Company had "made significant progress" in its glass strategy and that he was "very pleased with our progress over the first 90 days." In addition, he represented that the Company was "making good progress with Driven's existing . . . insurance partners and introducing them to our glass capabilities." Similarly, Defendant Mason boasted of the Company's progress with respect to integrating its auto-glass business, representing that the Company's "proven M&A playbook" was "delivering" in its "glass businesses."

104.     These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the construction of the Company's "platform" was incomplete and not functional, was plagued by fundamental issues, was operating through a POS system that would need to be recreated entirely, and was unable to service critical customers, including insurers; (2) due to the growing problems with Driven's auto-glass integration, the Company's timeline to complete integration experienced significant delays; (3) AGN's POS system, which was a crucial gating step for further integration, would need to be recreated from scratch, which would cause significant delays in integration and, thus, in Driven's growth and profitability; (4) even after construction of the improved POS system, integration would still only reach 50% completion; (5) the aforementioned delays were severely impacting Driven's auto-glass segment's performance, since a plethora of Driven's acquired businesses were unable to communicate with the AGN platform, the Company was unable to service key customers, and the Company was unable to integrate its new acquisitions; and (6) due to the foregoing, Driven's revenue and earnings growth would be negatively impacted. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

*May 25, 2022 Press Release*

105.     On May 25, 2022, the Company published a press release touting its car wash segment's operating capacity. In relevant part, the press release stated that the Company was "continu[ing] its growth trajectory" and had "celebrated another significant milestone – opening its 350th express car wash."

106.     These statements touting the Company's car wash segment's operating capacity were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

*July 27, 2022 Earnings Call*

107.     On July 27, 2022, the Company hosted an earnings call with analysts and investors. During the call, when asked by an analyst how customer experience and satisfaction had changed at the Company's car washes as a result of being integrated into Driven's Take 5 platform, Defendant Fitzpatrick responded: "[T]he experience for the customer is significantly better pre and post . . . rebranding," including because "any deferred maintenance that was there is done, so the equipment is working beautifully."

108.     These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and

maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

109.    With respect to the Company's glass business, Defendant Fitzpatrick represented that he was "very pleased with our progress in glass over the first 180 days" and that Driven was "making good progress with Driven's existing . . . insurance partners and introducing them to our glass capabilities." Similarly, Defendant Mason represented that the Company's "proven M&A playbook" was "delivering" in its "glass businesses."

110.    These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the construction of the Company's "platform" was incomplete and not functional, was plagued by fundamental issues, was operating through a POS system that would need to be recreated entirely, and was unable to service critical customers, including insurers; (2) due to the growing problems with Driven's auto-glass integration, the Company's timeline to complete integration experienced significant delays; (3) AGN's POS system, which was a crucial gating step for further integration, would need to be recreated from scratch, which would cause significant delays in integration and, thus, in Driven's growth and profitability; (4) even after construction of the improved POS system, integration would still only reach 50% completion; (5) the aforementioned delays were severely impacting Driven's auto-glass segment's performance, since a plethora of Driven's acquired businesses were unable to communicate with the AGN platform, the Company was unable to service key customers, and the Company was unable to integrate its new acquisitions; and (6) due to the foregoing, Driven's revenue and earnings growth would be

42

negatively impacted. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *September 7, 2022 Goldman Sachs Global Retailing Conference*

111.    On September 7, 2022, Defendant Fitzpatrick participated in the Goldman Sachs Global Retailing Conference on behalf of the Company. During the conference, Defendant Fitzpatrick boasted of the Company's subscription car wash business and represented that "it creates stickiness with the consumer, stickiness with the cash flows, predictability."

112.    These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### **The Truth Begins to Emerge as the False and Misleading Statements Continue**

### *October 26, 2022 Earnings Call*

113.    The truth began to emerge on October 26, 2022 when the Company published its earnings release for the third quarter of 2022 and hosted an earnings call with analysts and investors to discuss the same. Notably, Driven revealed surprising news with respect to its car wash and glass segments.

114.    In particular, the Company revealed delays in its auto-glass segment's ability to service insurers, with Defendant Fitzpatrick disclosing that the auto-glass business was still a year

away from being able to service insurers, which would not be added until "late 2023 and 2024." Analysts responded negatively to this development, with one noting on the earnings call that "a lot of investors are eager for you to open up that insurance opportunity" since it would "probably double the TAM [total addressable market]." Driven also announced that, with respect to its car wash segment, same-store sales had ***declined 3.4%*** year-over-year even ignoring foreign exchange issues.

115. On this news, the price per share of the Company's stock fell $2.31 per share, or over 7%, from a closing price of $32.37 per share on October 25, 2022 to close at $29.96 per share on October 26, 2022.

116. Analysts acknowledged that the Company's negative announcements would be likely to surprise investors, with Goldman Sachs reporting on October 26 that the delay in the Company's auto-glass segment's ability to generate revenue from insurance "may have surprised some investors that expected insurance growth within the business sooner." Similarly, Morgan Stanley reported on October 27 that the underperformance in Driven's car wash segment "could continue weighing on sentiment into '23" and that "ex FX comps of -3.4% were likely below expectations."

117. Still, despite this partial emergence of the truth, Defendants continued to mislead investors with respect to the true extent of the issues plaguing Driven's car wash and glass segments.

118. Indeed, during the October 25, 2022 earnings call, with respect to the Company having posted negative same-store sales growth in its car wash segment, Defendant Fitzpatrick stated that the Company "did experience some headwinds in the third quarter related to . . . softening retail volume as the result of the macro environment." Also on the call, Defendant Mason

44

boasted of the Company's car wash segment's "sticky" revenue and customer retention, representing that the Company "continue[d] to grow our Wash Club program" which was "not only a great recurring revenue stream that provides a level of predictability to this business, but it is also proving to be a sticky customer."

119.    These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

120.    With respect to the Company's glass business, Defendant Fitzpatrick represented that "we continued to make significant progress across our key growth levers [including] glass, leveraging our proven playbook."

121.    These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the construction of the Company's "platform" was incomplete and not functional, was plagued by fundamental issues, was operating through a POS system that would need to be recreated entirely, and was unable to service critical customers, including insurers; (2) due to the growing problems with Driven's auto-glass integration, the Company's timeline to complete integration experienced significant delays; (3) AGN's POS system, which was a crucial gating step for further integration, would need to be recreated from scratch, which would cause significant delays in integration and, thus, in Driven's growth and profitability; (4) even after construction of

45

the improved POS system, integration would still only reach 50% completion; (5) the aforementioned delays were severely impacting Driven's auto-glass segment's performance, since a plethora of Driven's acquired businesses were unable to communicate with the AGN platform, the Company was unable to service key customers, and the Company was unable to integrate its new acquisitions; and (6) due to the foregoing, Driven's revenue and earnings growth would be negatively impacted. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *December 6, 2022 Morgan Stanley Global Consumer Conference*

122.     On December 6, 2022, Defendant Fitzpatrick attended the Morgan Stanley Global Consumer Conference. At the conference, Defendant Fitzpatrick represented that competition was only "a small piece" of the "weakness" in Driven's car wash segment.

123.     These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *February 22, 2023 Earnings Call*

124.     On February 22, 2023, after reporting negative same-store sales growth in the car wash segment, Driven hosted a conference call with analysts and investors. During the call, Defendant Fitzpatrick represented that Driven's poor car wash results were caused by "softer retail

46

volume, as a result of the macroeconomic environment." He also attempted to reassure investors about the Company's car wash business, stating that Driven's "scale and experience will remain a significant competitive advantage" and boasting of the Company's "significant network benefits that deepen our competitive moat and differentiate our business."

125.     Later on the call, Defendant Mason represented that Driven "continued to . . . grow our subscription [car wash] program[,]" and further stated that it was "a great recurring revenue stream that provides a level of predictability to this business," and was "also proving to be a sticky customer and an important focus for Driven Brands."

126.     These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

127.     With respect to the Company's glass business, Defendant Fitzpatrick represented that construction of the glass platform itself was finished, stating that Driven "did a phenomenal job in 2022 building out that platform from zero to becoming the second largest player in the United States."

128.     These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the construction of the Company's "platform" was incomplete and not functional, was plagued by fundamental issues, was operating through a POS system that would need to be

47

recreated entirely, and was unable to service critical customers, including insurers; (2) due to the growing problems with Driven's auto-glass integration, the Company's timeline to complete integration experienced significant delays; (3) AGN's POS system, which was a crucial gating step for further integration, would need to be recreated from scratch, which would cause significant delays in integration and, thus, in Driven's growth and profitability; (4) even after construction of the improved POS system, integration would still only reach 50% completion; (5) the aforementioned delays were severely impacting Driven's auto-glass segment's performance, since a plethora of Driven's acquired businesses were unable to communicate with the AGN platform, the Company was unable to service key customers, and the Company was unable to integrate its new acquisitions; and (6) due to the foregoing, Driven's revenue and earnings growth would be negatively impacted. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *March 14, 2023 Bank of America Securities Consumer & Retail Conference*

129.     On March 14, 2023, Defendant Fitzpatrick attended the Bank of America Securities Consumer & Retail Conference on behalf of the Company. At the conference, Defendant Fitzpatrick represented that the Company had "built out our North America auto glass platform" in 2022 and had "built a really nice sort of base platform in the Glass business."

130.     These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the construction of the Company's "platform" was incomplete and not functional, was plagued by fundamental issues, was operating through a POS system that would need to be recreated entirely, and was unable to service critical customers, including insurers; (2) due to the growing problems with Driven's auto-glass integration, the Company's timeline to complete integration experienced significant delays; (3) AGN's POS system, which was a crucial gating

step for further integration, would need to be recreated from scratch, which would cause significant delays in integration and, thus, in Driven's growth and profitability; (4) even after construction of the improved POS system, integration would still only reach 50% completion; (5) the aforementioned delays were severely impacting Driven's auto-glass segment's performance, since a plethora of Driven's acquired businesses were unable to communicate with the AGN platform, the Company was unable to service key customers, and the Company was unable to integrate its new acquisitions; and (6) due to the foregoing, Driven's revenue and earnings growth would be negatively impacted. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *March 29, 2023 Press Release*

131. On March 29, 2023, the Company published a press release boasting of its car wash segment's operating capacity. In relevant part, the press release represented that the Company had "more than doubled its total footprint since Driven Brands entered in the car wash business in August 2020" and had "celebrated the grand opening of its 400th car wash."

132. These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *May 3, 2023 Earnings Call*

133. On May 3, 2023, after the Company again posted negative same-store sales growth in its car wash segment, Driven hosted an earnings call with analysts and investors. During the call, Defendant Fitzpatrick represented that this result was due to "softer retail volume as a result of the macro environment" but represented that the Company's "scale and experience will remain a significant competitive advantage as the current environment is beginning to rationalize the competitive intensity of new entrants." Similarly, Defendant Mason represented on the call that "retail volume was soft again this quarter as a result of the macroeconomic environment and poor weather condition." She also represented: that "[w]e attribute the softness over the last few quarters to both the macroeconomic environment and then this quarter, in particular, to poor weather conditions in . . . the U.S."; that "we've seen macroeconomic pressure specifically in the car wash business since about Q2 of last year" in the U.S.; and that "in Q1, it's probably equal parts, continued macroeconomic pressure, and then . . . the poor weather conditions."

134. These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

135. Also during the call, Defendant Fitzpatrick represented that the Company had "made significant progress integrating our 10 acquisitions" during the first quarter, stating: "We've combined the best processes, procedures, and technology to inform our standard operating model

50

that has been rolled out across the entire footprint." Similarly, Defendant Mason stated that the Company was "currently integrating our series of acquisitions under the Auto Glass Now brand name and implementing our new standard operating procedures" and that "we expect glass margins to expand from here as we integrate the business."

136.     These statements were materially false and misleading and failed to disclose, *inter alia*, that: (1) the construction of the Company's "platform" was incomplete and not functional, was plagued by fundamental issues, was operating through a POS system that would need to be recreated entirely, and was unable to service critical customers, including insurers; (2) due to the growing problems with Driven's auto-glass integration, the Company's timeline to complete integration experienced significant delays; (3) AGN's POS system, which was a crucial gating step for further integration, would need to be recreated from scratch, which would cause significant delays in integration and, thus, in Driven's growth and profitability; (4) even after construction of the improved POS system, integration would still only reach 50% completion; (5) the aforementioned delays were severely impacting Driven's auto-glass segment's performance, since a plethora of Driven's acquired businesses were unable to communicate with the AGN platform, the Company was unable to service key customers, and the Company was unable to integrate its new acquisitions; and (6) due to the foregoing, Driven's revenue and earnings growth would be negatively impacted. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Fully Emerges

### *May 8, 2023 Announcement*

137.     The truth continued to emerge on May 8, 2023 when Driven announced that it had terminated Defendant Mason as CFO on May 4, just one day after the Company had announced

51

its financial results for the first quarter of 2023. The Company reaffirmed its 2023 guidance issued on May 3 and announced that Ferrara would be replacing Defendant Mason as CFO effective May 10, 2023. The Company also announced that it would be postponing its investor day conference until September 2023 "due to the Company's recent CFO transition."

### August 2, 2023 Earnings Call

138.    The truth fully emerged on August 2, 2023 when, during an earnings call, Driven admitted that the Company's integrations in its glass segment were "***several quarters behind***" and were "***not going as quickly as planned.***" Due to the foregoing, the Company disclosed that it would substantially reduce the scope of its campaign for glass acquisition and would slash its new glass unit store growth for 2023 by about one-third, from 130 down to 90, as a way to "get the integration completed."

139.    In addition, with respect to its car wash segment, Driven announced a further 4% year-over-year same-store car wash sales decline, admitting that falling same-store sales were driven by "significant competitive . . . growth" over the prior two years and further revealing that the Company was in fact losing significant numbers of customers to these competitors.

140.    Due to these growing problems with its car wash and glass segments, the Company's two key growth drivers, Driven slashed its EPS guidance for 2023 by ***24%***, despite the fact that the Company had reaffirmed prior guidance just two months earlier.

141.    Notably, these disclosures evidenced that the problems Driven had been experiencing with its glass and car wash segments had been going on for quite some time. Indeed, when analysts inquired as to why the Company was only just disclosing that it was "several quarters behind" with its glass segment, particularly given that those issues likely would have been "emerging" for a fair amount of time, Defendant Fitzpatrick explained that Defendant Mason's

termination and replacement by Ferrara "60-or-so days ago" had provided "a chance for Gary with a fresh set of eyes to look at the business, to look at the assumptions" and determine that "we're probably a little bit behind where we want to be." He also admitted that the competitive intrusion issues plaguing the Company's car wash segment had been growing over "the last two years." In other words, Defendant Fitzpatrick effectively conceded that there had been no substantial developments that changed the progress for either business, but rather that the Company's new CFO had examined the same facts known to Defendants during the Relevant Period and had discovered, in less than two months, that these statements were inaccurate.

142.     On this news, the price of the Company's common stock fell $10.63 per share, or ***approximately 41%***, from a closing price of $25.83 per share on August 1, 2023 to close at $15.20 per share on August 2, 2023.

143.     Analysts responded negatively to these disclosures, with Credit Suisse analysts downgrading the Company's stock due to "[t]oday's results – including a worse than anticipated slowdown in the car wash segment [and] unexpected integration challenges in the glass space" and reporting that the Company's long-term EBITDA target "may prove to be overly optimistic." Similarly, William Blair analysts downgraded the Company's stock, stating that "[w]eakness in two Key Growth Pillars Cloud Visibility" and that "the company materially cut its 2023 outlook on weakness in Car Wash (softer U.S. demand) and auto glass (integration delays)." William Blair analysts further reported that "***[b]oth segments represent key growth pillars for Driven and raise questions about how quickly and deeply the businesses have turned*** (Driven reiterated its outlook as recently as mid-May) and whether the company's diversified business model also translates into enhanced execution risk."

**<u>Subsequent Developments</u>**

53

144.    On September 20, 2023, the Company hosted the investor day event that it had previously postponed due to Defendant Mason's termination. At the investor day event, Defendant Fitzpatrick again admitted that the auto-glass integration delay Driven had announced in August was caused by *a series of factors known to Defendants during the Relevant Period*, including the fact that the Company had "[taken] on a lot of integration involving a 1,000 employees, multiple businesses and multiple operating models," which "was a lot." Defendant Fitzpatrick further admitted that the Company "should have gone slower" and that Driven's integration had been so stalled that it would not be adding new units to its auto glass segment *until 2025* in order to focus on integration. With respect to the Company's car wash segment, Defendant Fitzpatrick admitted that its "performance is not acceptable" and that the Company would need to "fix it or think differently about the long-term."

145.    Following the event, analysts again expressed negative sentiment towards Driven, with Barclays analysts reporting the following, in relevant part:

> *There has been a significant shift in the narrative on DRVN in recent months*; this has gone from a company that had executed very well since going public, generally exceeding expectations and gaining share in a favorable consumer segment, to more recently one that has moved too quickly, struggled with execution, and is facing competitive issues.

146.    Later, on November 1, 2023, the Company hosted an earnings call with analysts and investors where the Company's COO acknowledged that Driven's glass business "integration challenges have resulted in underperformance of our U.S. glass business in 2023" and again noted that, as a result, Driven would be slowing the growth in this segment. In addition, Driven's COO revealed that Driven had only just then completed its rollout of AGN's new POS system and that it did not anticipate it would complete the integration until the first quarter of 2024, which was over a year later than what Driven had represented its integration timeline to be throughout the

Relevant Period. With respect to its car wash segment, the Company announced a massive $851 million write-down after "assessing underperforming stores and their local competitive environment" and further revealed that it would be closing dozens of its stores and halting the opening of new ones. Notably, this $851 million write-down made up more than 10% of the Company's entire asset value as of the end of 2022.

## DAMAGES TO DRIVEN

147.    As a direct and proximate result of the Individual Defendants' conduct, Driven will lose and expend many millions of dollars.

148.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO/President, and its former CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

149.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

150.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

151.    Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

152.    As a direct and proximate result of the Individual Defendants' conduct, Driven has

also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

153.     Plaintiff brings this action derivatively and for the benefit of Driven to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Driven, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

154.     Driven is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

155.     Plaintiff is, and has been at all relevant times, a shareholder of Driven. Plaintiff will adequately and fairly represent the interests of Driven in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

156.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.     A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Driven's Board consisted of the following ten individuals: Defendants Fitzpatrick, Aronson, Halligan, Hume, Puckett, Stroup, Swinburn, Thompson, and Tomás (the "Director-Defendants"), and non-party Damien Harmon (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were

on the Board at the time this action was filed.

158.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the materially false and misleading statements alleged herein. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

159.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Driven to issue materially false and misleading statements. Specifically, the Director-Defendants caused Driven to issue false and misleading statements which were intended to make Driven appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

160.    As Board members of Driven charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Driven, the Director-Defendants must have been aware of the material facts regarding the issues related to Driven's car wash and auto-glass segments, and that neither had the capabilities of substantially boosting the Company's growth initiatives due to the numerous problems discussed

57

herein. Indeed, in October 2021, the Company itself disclosed that two of the three most important components of its growth plan were to: (1) increase revenue by rapidly acquiring a network of auto-glass businesses around the country; and (2) increase earnings by driving customer retention and sales in Driven's purportedly stable car wash segment. As these two segments laid at the core of the Company's operations, it is reasonable to infer that the Director-Defendants knew of the problems with the auto-glass and car wash segments that were plaguing the Company but failed to disclose the same to investors. This is further supported by the fact that: (1) the Company's car wash segment was a key component of Driven's overall financial success, making up more than 10% of all revenue throughout the Company and more than 30% of Driven's earnings at the start of the Relevant Period; and (2) the Company announced that it would be expanding its business into the U.S. auto glass market, which it represented *would be the keystone of its plan to drive its revenue and earnings.* The knowledge of the Director-Defendants can also be inferred from the fact that, even after only having been at the Company 60 days, Ferrara was able to discover the inconsistencies with the statements Defendants had repeatedly made to the public regarding these segments. Thus, it can be inferred that the Director-Defendants, who were all on the Board for significantly longer than 60 days, knew that the statements they and the other Defendants were making to the investing public were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the foregoing, demand on the Director-Defendants is further excused.

161.    Additional reasons that demand on Defendant Fitzpatrick is futile follow. Defendant Fitzpatrick has served as the Company's President and CEO since July 2012 and as a Company director since April 2018. He also previously served as a member of the board of managers of Driven Investor LLC. The Company provides Defendant Fitzpatrick with his

principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, Defendant Fitzpatrick was ultimately responsible for the Company's issuance of false and misleading statements during the Relevant Period. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Fitzpatrick is named as a defendant in the Securities Class Action. In addition, as noted above by several former Company employees interviewed in the Securities Class Action, Defendant Fitzpatrick was regularly updated on the issues pertaining to Driven's car wash and auto-glass segments but continued to mislead investors with respect to the same. For these reasons, Defendant Fitzpatrick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.     Additional reasons that demand on Defendant Aronson is futile follow. Defendant Aronson has served as Chair of the Board since January 2021 and as a Company director since December 2020. He previously served as a member of the board of managers of Driven Investor LLC. Defendant Aronson has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales, made with knowledge of material nonpublic information before the information was disclosed to the public, further demonstrates his motive in participating in the scheme. For these reasons, Defendant

Aronson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.     Additional reasons that demand on Defendant Halligan is futile follow. Defendant Halligan has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC. She also serves as Chair of the Compensation Committee and as a member of the Governance Committee. Defendant Halligan has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Halligan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

164.     Additional reasons that demand on Defendant Hume is futile follow. Defendant Hume has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Defendant Hume has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hume breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

60

165. Additional reasons that demand on Defendant Puckett is futile follow. Defendant Puckett has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC. He also serves as Chair of the Audit Committee. Defendant Puckett has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Puckett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166. Additional reasons that demand on Defendant Stroup is futile follow. Defendant Stroup has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC. She also serves as a member of the Audit Committee and the Compensation Committee. Defendant Stroup has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Stroup breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

167. Additional reasons that demand on Defendant Swinburn is futile follow. Defendant Swinburn has served as a Company director since December 2020 and previously served as a

member of the board of managers of Driven Investor LLC. Defendant Swinburn has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Swinburn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as a Company director since December 2020 and previously served as a member of the board of managers of Driven Investor LLC. Defendant Thompson has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Tomás is futile follow. Defendant Tomás has served as a Company director since July 2022. Defendant Tomás has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Tomás breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170. Additional reasons that demand on the Board is futile follow.

171. Defendants Puckett (as Chair), Stroup, and Swinburn (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

172. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts

63

of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

173. Driven has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Driven any part of the damages Driven suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

174. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

175. The acts complained of herein constitute violations of fiduciary duties owed by Driven's officers and directors, and these acts are incapable of ratification.

176. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Driven. If there is a directors' and officers'

liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Driven, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

177.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Driven to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

178.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

179.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Driven's business and affairs.

181.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

182.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Driven.

183.     In breach of their fiduciary duties owed to Driven, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's car wash segment struggled as a result of extensive equipment failures and poor service; (2) the Company failed to properly invest in service, equipment, and maintenance in the car wash segment of its business, which resulted in, *inter alia*, significant impairments to the segment's operating capacity; and (3) due to the foregoing, the Company's car wash segment was undergoing significant customer loss, intrusion from competitors, and declining same-store sales. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

184.     In addition, Defendants' statements failed to disclose, *inter alia*, that: (1) the construction of the Company's "platform" was incomplete and not functional, was plagued by fundamental issues, was operating through a POS system that would need to be recreated entirely, and was unable to service critical customers, including insurers; (2) due to the growing problems with Driven's auto-glass integration, the Company's timeline to complete integration experienced significant delays; (3) AGN's POS system, which was a crucial gating step for further integration, would need to be recreated from scratch, which would cause significant delays in integration and, thus, in Driven's growth and profitability; (4) even after construction of the improved POS system, integration would still only reach 50% completion; (5) the aforementioned delays were severely

66

impacting Driven's auto-glass segment's performance, since a plethora of Driven's acquired businesses were unable to communicate with the AGN platform, the Company was unable to service key customers, and the Company was unable to integrate its new acquisitions; and (6) due to the foregoing, Driven's revenue and earnings growth would be negatively impacted. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

185.     In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

186.     Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

187.     Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in a lucrative insider sale of Company common stock while the price of stock was artificially inflated, obtaining proceeds of ***over $225 million.***

188.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price

67

of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

189.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Driven has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.    Plaintiff, on behalf of Driven, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Driven.

194.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Driven that was tied to the performance or artificially inflated valuation of Driven, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

195.    Plaintiff, as a shareholder and representative of Driven, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

196.    Plaintiff, on behalf of Driven, has no adequate remedy at law.

68

## THIRD CLAIM
## Against the Individual Defendants for Abuse of Control

197.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Driven, for which they are legally responsible.

199.     As a direct and proximate result of the Individual Defendants' abuse of control, Driven has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.     Plaintiff, on behalf of Driven, has no adequate remedy at law.

## FOURTH CLAIM
## Against the Individual Defendants for Gross Mismanagement

201.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Driven in a manner consistent with the operations of a publicly held corporation.

203.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Driven has sustained and will continue to sustain significant damages.

204.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

205.     Plaintiff, on behalf of Driven, has no adequate remedy at law.

69

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

206.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

208.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

209.    Plaintiff, on behalf of Driven, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Fitzpatrick and Mason for Contribution Under Sections 10(b) and 21D of the Exchange Act

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.    Driven and Defendants Fitzpatrick and Mason are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Fitzpatrick's and Mason's willful and/or reckless violations of their obligations as officers and/or directors of Driven.

212.    Defendants Fitzpatrick and Mason, because of their positions of control and authority as officers and/or directors of Driven, were able to and did, directly and/or indirectly,

70

exercise control over the business and corporate affairs of Driven, including the wrongful acts complained of herein and in the Securities Class Action.

213. Accordingly, Defendants Fitzpatrick and Mason are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

214. As such, Driven is entitled to receive all appropriate contribution or indemnification from Defendants Fitzpatrick and Mason.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Driven, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Driven;

(c) Determining and awarding to Driven the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Driven and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Driven and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions

as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.  a provision to permit the shareholders of Driven to nominate at least five candidates for election to the Board;

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

      (e)     Awarding Driven restitution from the Individual Defendants, and each of them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: January 10, 2025


            Respectfully submitted,

            **HAUSLER LAW FIRM, PLLC**

            */s/ KURT F. HAUSLER*
            Kurt F. Hausler
            NC Bar No. 22103
            524 East Boulevard
            Charlotte, NC 28203
            Telephone: (704) 247-3255

Fax: (704) 247-3267
Email: khausler@hauslerlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

I, Daniel Terwilliger, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9 __ day of January, 2025.

Signed by:

*Daniel Terwilliger*

DE3D20C6F638417

Daniel Terwilliger